Harmeet K. Dhillon (NY 2667350)
Nitoj Singh (*pro hac vice* to be filed)
**DHILLON LAW GROUP, INC.**
177 Post St. Suite 700
San Francisco, CA 94108
(415) 433-1700

Brian J. Dunne (NY 4605580)
David L. Hecht (NY 4695961)
**PIERCE BAINBRIDGE BECK PRICE & HECHT LLP**
277 Park Avenue, 45th Floor
New York, NY  10172
(212) 484-9866

*Attorneys for Plaintiffs Alex and Ani LLC*
*and A and A Shareholding Co., LLC*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **Alex and Ani LLC** and **A and A Shareholding Co., LLC**,<br><br>                    Plaintiffs,<br><br>        v.<br><br>**Bank of America, N.A.**, and **Does 1-10**,<br><br>                    Defendants. | Civil Action No.<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR BREACH OF CONTRACT, TORTIOUS INTERFERENCE, AND**
**VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT**

Plaintiffs Alex and Ani LLC and A and A Shareholding Co., LLC (collectively, "Alex and Ani") bring this lawsuit against defendant Bank of America, N.A. ("Bank of America" or "BofA") to stop an existential threat to Alex and Ani's business: Bank of America's gender bias and greed. Bank of America breached its contract with Alex and Ani; tortiously interfered with Alex and Ani's business; and violated (and continues to violate) federal antidiscrimination law by engaging

1

in discriminatory and illegal lending practices toward Alex and Ani because the company is led by a trio of strong women, including founder and CEO Carolyn Rafaelian.  Plaintiffs seek declaratory and injunctive relief and $1.1 billion in damages.

## NATURE OF THE ACTION

1.      This lawsuit is about Bank of America's promises—promises made, and promises broken—and the catastrophic effects they have visited upon an American success story, plaintiff Alex and Ani.

2.      Since 2008—when it helped drive the United States economy into the ground, then took money from the government to keep itself afloat—Bank of America has made a lot of promises. It has promised to pay close to $100 billion in fines and settlements for misdeeds ranging from mortgage abuses,[12] to investor protection violations,[3] to race-[4] and gender-based[5] employment discrimination. It has promised to improve its decades-long history of fraud and mismanagement, and to "look every . . . customer in the eye."[6] And it has promised to "invest in women's economic empowerment and leadership" by "connect[ing] women entrepreneurs to mentoring, capital and other tools that will give them the power to advance their businesses and make significant contributions to our global economy."[7]

---

[1] *See, e.g.,* https://www.justice.gov/opa/pr/bank-america-pay-1665-billion-historic-justice-department-settlement-financial-fraud-leading.

[2] *See, e.g.,* https://www.dol.gov/newsroom/releases/osha/osha20110914.

[3] *See, e.g.,* https://www.marketwatch.com/story/ny-ag-fines-bank-of-america-42-million-for-fraudulent-masking-scheme-2018-03-23.

[4] https://money.cnn.com/2013/09/24/news/companies/bofa-racial-discrimination/.

[5] *See, e.g.,* https://dealbook.nytimes.com/2013/09/06/bank-of-america-to-pay-39-million-in-gender-bias-case/.

[6] *See, e.g.,* https://www.barrons.com/articles/bank-of-america-ceo-brian-moynihan-interview-51561145152.

[7] *See, e.g.,* https://about.bankofamerica.com/en-us/what-guides-us/investing-in-women.html.

3.     In ostensible service to the above, in 2016 Bank of America made a promise to one such woman entrepreneur: Carolyn Rafaelian, the American working mother who founded and leads plaintiff Alex and Ani.

4.     Alex and Ani is a shining example of the American Dream.  From modest roots in the basement of an old Rhode Island jewelry factory, Rafaelian built a $1.2 billion company founded on certain core principles:

- Alex and Ani only uses products and materials made in America;

- Alex and Ani donates a significant portion of its sales (and time) to charity—more than $60 million dollars to date donated to fifty-five charities, and more than 11,000 Alex and Ani employee hours donated to not-for-profit organizations through the company's Charity By Design program; and

- Alex and Ani is led by women: CEO Rafaelian, SVP of Brand Strategy Kate Robinson, and CFO Andrea Ruda.

5.     Alex and Ani produces artisanally crafted, made in America products. These pieces are meticulously researched and designed as a fusion of ancient and modern technology—and they are made through partnerships with small American businesses. Alex and Ani's conscious support of American small businesses is both key to its business model and key to the continued livelihood of these Main Street operations.

6.     Rafaelian, Robinson, and Ruda—the women who lead Alex and Ani—are shown below.



7.    As memorialized in a written Agreement, Bank of America promised Rafaelian that so long as Alex and Ani made timely payments and otherwise complied with specified contractual terms, Bank of America would provide a revolving line of credit ("the Revolver") to help fund Alex and Ani's operations.

8.    Alex and Ani made its payments. It complied with the terms of its bargain.  But in December 2018, Bank of America broke its promise. With no warning, and in breach of its contractual obligations, Bank of America declared a default under the 2016 Agreement.

9.    In fact, there was no default in December 2018, but Bank of America wouldn't listen—another breach of its promises to Alex and Ani. And by falsely declaring a default, Bank of America set off a cascading series of events that cost Alex and Ani more than $1.1 billion in direct expenses, lost revenues, and diminished market value.

10.    Since a female CFO took over at Alex and Ani in December 2017, Bank of America has, without justification (and contrary to any objective business sense):

- falsely declared a default by Alex and Ani;

- cut off Alex and Ani's access to its revolving credit line;

- **charged Alex and Ani an "unused revolver fee" every month for *a revolver to which Bank of America blocked access*; and (unbelievably)**

- ***refused to disclose to Alex and Ani the results of a restructuring analysis that BofA made Alex and Ani pay for, which pertains to suggested actions by and within Alex and Ani itself***.

11.     There is no legal justification—business or otherwise—for the above behavior.

12.     True to their nature, Alex and Ani persisted in the face of these obstacles thrown in its way by its lender and supposed ally, Bank of America.  In fact, thanks to the hard work and financial acumen of its female-led executive team, Alex and Ani has actually shown year-over-year earnings ***growth*** in some months of 2019, despite being starved of critical marketing and operational capital by Bank of America.  But make no mistake—BofA had driven Alex and Ani to the precipice.  No amount of acumen, savvy, and hard work can fully overcome a primary lender's sustained, illegal deprivation of operating capital, coupled with millions of dollars a month in unnecessary fees and interest demanded at the threat of liquidating the company.

13.     Since December 2018, Bank of America's conduct toward Alex and Ani has been vindictive, obstinate, and petty.  But it is hardly inexplicable.  As set forth in this Complaint, Bank of America breached its agreement with Alex and Ani, and threatened the company's very existence, based on two time-tested BofA values: greed and sexism.

14.     Between 2010 and 2017, Bank of America's corporate profits grew from zero to $28 billion.  This was not an accident.  As Bank of America CEO Brian Moynihan put it in a letter to shareholders at the end of 2017, the bank's mission was to "[g]row and win in the market, no excuses."  Less than a month later, Bank of America instituted monthly checking fees for its poorest users.[8]  Quarterly profits jumped 32% year-over-year by for Q3 2018.[9]

---

[8] https://www.huffpost.com/entry/bank-of-america-charge-checking-account_n_5a68a762e4b0dc592a0e91d6.
[9] https://www.wsj.com/articles/bank-of-america-profit-moves-higher-1539601172.

15.     But as 2019 approached, Bank of America still was not satisfied.  As Moynihan explained on a conference call with investors in October 2018, "[w]e can do better."

16.     Shortly thereafter, Bank of America cast its rapacious eyes toward Alex and Ani—a canonical example of the woman-led businesses it purports to assist in its image-rehabilitating marketing—and saw both opportunity and annoyance.

17.     For many years, Bank of America was happy to use Alex and Ani as free advertising for its supposed commitment to diversity and the American Dream.  This is Bank of America executive Oliver Bennett walking with Rafaelian and giving an interview in front of Alex and Ani's "meaning wall" as part of a Bank of America advertisement:







18.     As Bennett explained in the video: "We provide Alex and Ani with credit facilities that allow them to grow, to expand, to purchase more inventory ...."

19.     And for little while, that was true.  From January 2016 through December 2017, Bank of America's relationship with Alex and Ani was comfortable—and fee-laden.  Under the helmsmanship of former CFO Bob Woodruff, Bank of America raided the Alex and Ani corporate kitty, harvesting millions of dollars from the company through bloated fees, nonsensical consulting arrangements, and gold-plated reimbursements.

20.     But in December 2017, a new sheriff arrived as Alex and Ani Chief Financial Officer—Andrea Ruda.  Ruda is young, no-nonsense, and driven to cut costs and trim the fat.  For example, since she started as CFO, Ruda has (among other things):

- reduced annualized payroll costs by approximately $19 million;

- cut ongoing costs by approximately $4.5 million through consolidation and contract negotiation;

- reviewed productivity and profitability of the Alex and Ani wholesale network;

- commissioned a third-party review of Alex and Ani's eCommerce/web platform to reverse sales losses; and

- undertaken additional costs reductions including reducing per diem for work travel, renegotiating licensing agreements, revamping corporate card policies, and renegotiating leases and exits.

21.     Ruda's actions quickly shored up Alex and Ani's bottom line—ostensibly protecting Bank of America's investment. But there was one issue:



22.     Ruda is a woman, which (despite its market-facing messaging) Bank of America considers to be a problem.

23.     In fact, despite Bank of America's woke advertising, the company is decidedly retrograde in its views toward women, toward people of color, and towards other protected groups. And despite the American flag in Bank of America's logo, the company is decidedly un-American in its actions. While it has let Alex and Ani—which has always sold ***only*** American-made goods, from American materials—twist in the wind, Bank of America's principal owner Warren Buffett has happily infused capital into Chrysalis, a foreign company that sells Chinese-made knockoffs of Alex and Ani designs to American consumers.[10]

24.     Bank of America has a gender bias problem. This has been proven time and time[11] and time[12] and time[13] again. In fact, as far as corporate discrimination goes, Bank of America is the leader in the clubhouse:

---

[10] Chrysalis, a foreign-owned fashion jeweler that manufactures knockoffs of Alex and Ani designs in China, has received significant financial support from Buffett. In fact, Chrysalis sells a Chinese-made "Chrysalis Berkshire Hathaway Bangle Bracelet Set" with Buffett's picture on it.

[11] https://www.reuters.com/article/us-bankofamerica-bias-settlement/u-s-court-oks-bank-of-america-39-million-gender-bias-deal-idUSBRE9BQ0J020131227.

[12] https://www.reuters.com/article/us-bank-of-america-lawsuit-genderbias-idUSKCN11R2P6

[13] https://www.goodjobsfirst.org/sites/default/files/docs/pdfs/BigBusinessBias.pdf (identifying eight separate Bank of America discrimination settlements, totaling $210 million, between January 2000 and January 2019). Note that three of the top ten offenders—Coke, Wells Fargo, and Bank of America—are significantly backed by Warren Buffett.

**Table 1. Parent Companies with the Highest Disclosed Discrimination Penalties**

| Rank | Parent | Penalty Total | Cases |
|------|--------|---------------|-------|
| 1 | Bank of America | $210,296,593 | 8 |
| 2 | Coca-Cola | $200,616,000 | 9 |
| 3 | Novartis | $183,000,000 | 2 |
| 4 | Morgan Stanley | $150,385,000 | 6 |
| 5 | Abercrombie & Fitch | $90,115,600 | 4 |
| 6 | FedEx | $80,035,138 | 15 |
| 7 | Boeing | $79,935,059 | 7 |
| 8 | Verizon Communications | $71,504,891 | 6 |
| 9 | Wells Fargo | $68,099,000 | 5 |
| 10 | SoftBank (parent of Sprint) | $62,852,756 | 3 |
| 11 | Walmart | $52,888,031 | 27 |
| 12 | Rent-A-Center | $49,100,000 | 2 |
| 13 | United Continental | $48,228,069 | 9 |
| 14 | YRC Worldwide | $45,516,008 | 6 |
| 15 | Dollar Tree | $45,045,000 | 2 |
| 16 | MetLife | $42,500,000 | 2 |
| 17 | Walgreens Boots Alliance | $41,435,000 | 5 |
| 18 | Ford Motor | $34,225,000 | 4 |
| 19 | Southeastern Grocers (parent of Winn-Dixie) | $32,020,000 | 1 |
| 20 | American Express | $31,000,000 | 1 |
| 21 | R.R. Donnelley & Sons | $30,630,552 | 4 |
| 22 | Twenty-First Century Fox | $30,000,000 | 2 |
| 23 | Norfolk Southern | $29,058,521 | 5 |
| 24 | JPMorgan Chase | $27,650,000 | 3 |
| 25 | United Parcel Service | $27,348,304 | 15 |

25.    In view of Bank of America's checkered past with respect to gender bias in lending, it is perhaps unsurprising what happened after a triumvirate of strong women, including Rafaelian, Ruda, and Robinson took over control of Alex and Ani in 2018.  But it is no less illegal.

26.    Bank of America breached the Agreement, fraudulently alleging a default that didn't exist.  Then Bank of America tortiously interfered with Alex and Ani's business, starving it of marketing and operational funding Alex and Ani was contractually guaranteed under the Agreement.  And for more than six months now, Bank of America has been both driving Alex and Ani towards bankruptcy and milking it for literally tens of millions of dollars in fees.  The endgame is clear: Bank of America wants the women out of power at Alex and Ani.  It wants to bring back the good old days, when a male Alex and Ani CFO let Bank of America charge whatever it wanted for BofA's putative "services."

27.     But those days are over.  And Alex and Ani brings this lawsuit to regain what it would already have had from a fair, law-abiding lender: the benefit of its bargain under the Agreement, and a bank whose practices match its glossy marketing—*i.e.,* one that doesn't recoil at female-run corporations and women in the boardroom.

28.     Bank of America made promises to Alex and Ani—about the availability of credit; about its commitment to American entrepreneurship; about its commitment to women and diversity.  Alex and Ani held up its end of the bargain—now it is time for BofA to honor its obligations.

## THE PARTIES

29.     Plaintiff Alex and Ani, LLC is a Rhode Island limited liability company with its principal place of business in Rhode Island.

30.     Plaintiff A and A Shareholding Co., LLC is a Delaware limited liability company with its principal place of business in Rhode Island.

31.     Defendant Bank of America, N.A. is a Delaware corporation with its principal place of business in Charlotte, North Carolina.  Bank of America is pervasively present in New York State and in this judicial district, and is subject to general personal jurisdiction in the Southern District of New York.

## JURISDICTION AND VENUE

32.     This Court has original subject matter jurisdiction over the Equal Credit Opportunity Act claim (Count Three), 15 U.S.C. § 1691 *et seq.*, under 28 U.S.C. §§ 1331 and 1338(a).

33.    This Court has supplemental subject matter jurisdiction over the   Breach of Contract and Tortious Interference claims (Counts One and Two), which arise under New York State law, under 28 U.S.C. § 1367.

34.    Venue is proper in this district under 28 U.S.C. § 1391 because a significant portion of the activities giving rise to the claims in this action occurred in the Southern District of New York.

### FACTS AND BACKGROUND

35.    Alex and Ani—named after the eldest daughters of its founder and CEO Carolyn Rafaelian—is a woman-owned, woman-founded, and woman-run company.  Alex and Ani makes iconic, unique jewelry such as the items pictured below:

  

36.    Rafaelian started Alex and Ani in 2004 as a young working mother, after a childhood learning the ins and outs of jewelry manufacturing and design from her father in Rhode Island. Today, Rafaelian runs the company alongside two other women—Chief Financial Officer Andrea Ruda and Senior Vice President Kate Robinson.  The company is still based in Rhode Island, and it employs over 1,500 people nationwide.

37.    From its inception, Alex and Ani has reflected the vision, charitable focus, and desire to spread positive energy around the globe of its founder Rafaelian. Alex and Ani has donated more than $60 million to charities worldwide since 2011 through the company's Charity

By Design program. Additionally, through Charity By Design, Alex and Ani employees have donated more than 11,000 hours of volunteer time to not-for-profit organizations that (among many other things) feed hungry children; provide clean water to rural communities; fund cancer research; and provide life-saving medicine for chronically ill patients. Alex and Ani's jewelry is artisan-crafted by American small businesses. The longstanding, mutually-beneficial relationships between Alex and Ani and its American small-business suppliers and vendors are unique to the industry—and critical to the livelihood of these suppliers and vendors. Many of Alex and Ani's vendor relationships with American small businesses span multiple generations of Rafaelian's family business—American-made jewelry.

38.     Alex and Ani's jewelry reflects Rafaelian's deep reverence for powerful and sacred symbols that inspire awareness, and express empowerment and inner beauty. Meticulously researched and fused between ancient cultures and modern technology, Alex and Ani's pieces are consciously-designed, wholly unique, and beloved by women and men across the United States.

39.     Alex and Ani is uniquely and fundamentally an American company. Everything the company produces—from the jewelry itself to the metal on its storefronts—is made in America. The company headquarters remains where it started—Rhode Island. And Alex and Ani employs hundreds of American women, including its three top executives.

40.     In 2016, Alex and Ani launched the iconic Liberty Copper Collection, featuring original copper preserved from the centennial restoration of the Statue of Liberty. This collection was (and remains) a labor of love for Rafaelian, whose commitment to spreading Lady Liberty's message of love and hope is at the core of everything she creates.

41.     Alex and Ani isn't just an American company—it's an American success story, and a true embodiment of the American dream. In 2004, Rafaelian was a working mother with a

passion for jewelry and an abiding belief that her designs could lift people up around the world. And over the course of a decade and a half, that's exactly what happened. Today, Rafaelian's designs are worn proudly by millions of young (at heart) women and men around the globe; her company has donated tens of millions of dollars to charity; and more than 1500 people are employed making, selling, marketing, and otherwise disseminating Rafaelian's unique, meaningful jewelry through Alex and Ani.

      **a.**    **The Credit Agreement**

42.    Rafaelian founded Alex and Ani in 2004. The brand quickly became a fixture in high-end department stores such as Bloomingdale's and Nordstrom. In 2009, Rafaelian decided to open the first Alex and Ani retail store, in Newport, Rhode Island.

43.    Shortly thereafter, the company experienced explosive growth and success. Between 2009 and 2016, Alex and Ani grew from $5 million to more than $300 million in annual sales. Its retail footprint grew from one store to 100. And it entered into major licensing deals, producing unique jewelry imbued with characters and logos from Walt Disney, the National Football league, and the United States military (among others).

44.    Alex and Ani jewelry isn't just designed in America—it's manufactured here. Alex and Ani's emphasis on "Made in America" distinguishes it from the hordes of cheap foreign products that flood America's markets—for example, the Chinese-made Chrysalis knockoffs backed by Bank of America owner Warren Buffett. In 2015, in order to secure its American-made heritage, Alex and Ani decided to purchase the factory that makes its jewelry to control its supply chain from the ground up.

45.    For Alex and Ani, the purchase of its supplier was like buying a house. It made long-term financial sense, but the company needed a mortgage to finance the purchase. In

particular, the purchase price was over $100 million, and Alex and Ani didn't have that kind of

cash lying around. With that said, in 2015 Alex and Ani had a valuation of $1.2 billion, massive

year-over-year growth, and hundreds of millions of dollars in annual revenue, so a $140 million

acquisition that allowed the company to own its entire supply chain made economic sense.

46.     In order to get the money it needed to buy its supplier, Alex and Ani did what any

house buyer would do: it went to a bank. Specifically, Alex and Ani went to Bank of America,

which (together with six other banks) put together something akin to a mortgage—the Credit

Agreement (the "Agreement").

47.     The Agreement, which was executed in January 2016 and amended three times

afterwards, set forth a number of promises on both sides. First (as relevant here), it set forth the

terms of a so-called "term loan" to Alex and Ani for the purchase of its supplier—approximately

$170 million, with interest—to be repaid over a number of years. Next, the Agreement set forth

the terms of another loan called a "Revolving Loan" or a "Revolver."

48.     The Revolver was to be a $50 million credit facility that Alex and Ani could draw

upon any time, for any reason. This kind of on-demand facility is absolutely indispensable to a

retailer such as Alex and Ani, given massively uneven revenues and expenditures across time in

the retail jewelry market. For example, Alex and Ani may receive as much as 70% of its entire

annual revenue over three holiday periods: Valentine's Day, Mother's Day, and the

Christmas/Holiday season.  Without access to on-demand credit throughout the year in the form

of a revolver, Alex and Ani can't properly stock up for holidays—or pay its vendors and shippers

during these critical periods—regardless of how well the company is doing financially.

49.     Under the Agreement, the lending banks—led by Bank of America—are ***required***

to loan Alex and Ani under the Revolver, up to the $50 million limit. The obligation is not

discretionary, and it does not require justification or explanation by Alex and Ani. That's the point of the Revolver—it's a readily accessible credit facility tailored to the unique revenues and expenditures of the retail industry. Cutting off a retailer's Revolver isn't just a nuisance; it's an existential threat.  And Bank of America knew this.

50.     In fact, there is really only one way to suspend the Revolver under the Agreement— If the Borrower defaults.  However, only a few defined actions by the Borrower qualify, as Events of Default are specifically and expressly set forth in the Agreement.

**b.    The Bob Woodruff Era**

51.     In 2016, shortly after the Agreement was executed, Alex and Ani hired a new CFO—Bob Woodruff.  This is Bob:



52.     Woodruff was CFO for about a year, and in his short tenure he was involved in a series of unjustifiable—even reckless—financial and operational decisions.  For example, an eCommerce platform change under Woodruff's regime resulted in an $8 million sales decline in

2018.  Excessive infrastructure build costs under Woodruff stretched into the tens of millions in excess costs.  Woodruff signed or renewed unprofitable leases; oversaw inventory planning inadequacies resulting in more than $10 million in lost sales; and failed to address (and indeed exacerbated) the draining of Alex and Ani coffers through bloated corporate travel and credit card policies.

53.     Despite all of the above, Bank of America was comfortable with Woodruff's "leadership."  In fact, Bank of America gave Woodruff extensions of time on its lines of credit (thereby earning more fees).

54.     Indeed, Woodruff had a cozier relationship with Alex and Ani's lenders than he did with Rafaelian, from whom he concealed information about Alex and Ani's finances.

**c.     Andrea Ruda Joins As CFO**

55.     In December 2017, after overseeing a rapid decline in profits (but a cozy relationship with Bank of America), Woodruff was replaced as CFO of Alex and Ani by Andrea Ruda, a then-twenty-six-year-old woman.

56.     From her first day at Alex and Ani, Ruda spearheaded aggressive cost-cutting and efficiency reviews across the entire company in order to shore up reserves, cash flow, and EBITDA.  For example, beginning in December 2017, Ruda spearheaded at least the following initiatives to shore up the Alex and Ani bottom line:

- retained PriceWaterhouseCoopers, the accounting firm, to conduct a full outside audit for 2018

- reduced annualized payroll costs by approximately $19 million;

- cut ongoing costs by approximately $4.5 million through consolidation and contract negotiation;

- reviewed productivity and profitability of the Alex and Ani wholesale network, resulting in the strategic closing of approximately 260 accounts;

- commissioned a third-party review of Alex and Ani's eCommerce/web platform to reverse sales losses; and

- undertook additional costs reductions including reducing per diem for work travel, renegotiating licensing agreements, revamping corporate card policies, and renegotiating leases and exits.

57.     But unlike Woodruff, Ruda did not enjoy an easygoing, friendly relationship with Bank of America.  As soon as Ruda started as CFO, Bank of America began advocating for the hiring of expensive outside consultants—and specifically, a third-party Chief Restructuring Officer ("CRO") to run Alex and Ani's finances instead of Ruda.  As Ruda's tenure as CFO stretched on, she found Bank of America increasingly uncooperative, despite Ruda's herculean— and objectively successful—efforts to shore up and turn around Alex and Ani's finances.

58.     By any fair measure, Ruda's tenure as CFO has been an astounding success.  From December 2017 through November 2018, Ruda immediately and significantly cut costs, renegotiated contracts, and radically improved Alex and Ani's bottom-line fundamentals. Ruda worked diligently (and constantly) to fix the mess left by Woodruff, and to move Alex and Ani onto its strongest-ever financial ground.

59.     And yet, from the very moment Ruda was hired as CFO, Bank of America was fixated on bringing in an outside CRO to take over her position (and to oversee Rafaelian and other top Alex and Ani executives like SVP of Branding Kate Robinson as well). It seemed that Bank of America couldn't see what was right in front of its face: that Ruda was successfully restructuring Alex and Ani from within, without the need for high-priced Bank of America-hired consultants.

### d.    Bank of America Lies About Default

60.    For more than a year after the departure of Woodruff (an objectively problematic CFO whom Bank of America was nonetheless comfortable with) and the arrival of Ruda (an objectively excellent CFO whom Bank of America was constantly working to undermine), Bank of America tried and failed to convince Alex and Ani to bring in expensive outside consultants and a CRO. Unsurprisingly, Rafaelian and her executive team were not interested in paying third parties to perform work that Ruda was already doing very effectively.

61.    In December 2018, Bank of America decided to cheat to get what it wanted. Under the Agreement, if Alex and Ani ***defaulted,*** Bank of America could arguably, among other things: (i) raise the interest rate on Alex and Ani's loans; (ii) charge Alex and Ani additional fees; and (iii) make Alex and Ani hire financial consultants and a CRO, at Alex and Ani's expense. Moreover, if Alex and Ani defaulted, Bank of America could suspend the Revolver, thereby using the existential threat of lack of credit to extract further concessions from Alex and Ani.

62.    But under Ruda's careful stewardship, Alex and Ani did not actually default in late 2018. In fact, Alex and Ani always made its payments on time; it always submitted full and accurate reports; and it managed to keep its net leverage ratio within contractual limits despite a difficult retail market and a collection of bad expenses left over from the Woodruff regime.

63.    Without an actual default by Alex and Ani, Bank of America made one up. In November 2018, Alex and Ani submitted to a Compliance Certificate and Consolidated EBITDA statement for the twelve-month period preceding November 3, 2018 to Bank of America. The Consolidated EBITDA statement included, among other categories, a category for

> fees and expenses (or minus cash income or gain) incurred in
> connection with any Permitted Acquisition, Disposition, Indebtness
> (including, without limitation, under the Credit Agreement)
> incurred, refinanced, modified or repaid, Equity Interests made and

recapitalizations, in each case, to the extent permitted under the
Credit Agreement whether or not successful.

64.     The above category, which is defined as part (viii) of Consolidated EBITDA in the

Agreement, allows Alex and Ani to report non-recurring fees and expenses related to a permitted

acquisition or other debt as part of EBITDA, because such an expense is unrelated to prospective

profitability and loan-to-value.  This is referred to as an "add-back."

65.     In November 2018, Alex and Ani had to pay a known, approved contingent

payment of $8.73 million in connection with Alex and Ani's 2016 purchase of its supplier.  This

was an Permitted Acquisition under the Agreement—in fact, it was the expressly-understood

purpose for the Agreement. Moreover, there could be no serious dispute that the one-time

contingent payment for purchase of the supplier's operations was a non-recurring fee or expense.

66.     Nonetheless, on December 18, 2018, Bank of America sent a letter asserting (with

no explanation, and contrary to the plain language of the Agreement) that the $8.73 million was

**not** a "fees and expenses" add-back, and declaring Alex and Ani to be in default of the Agreement.

Bank of America immediately suspended the Revolver:

> In accordance with the Administrative Agent's rights under the Loan
> Documents, the Administrative Agent, with the consent of all of the
> Lenders, has elected, as of the date of this letter, that (i) Revolving
> Loans shall be made, if at all, in the sole discretion of the Lenders
> and (ii) the issuance or amendment of Letters of Credit shall be
> issued or amended, if at all, in the sole discretion of the L/C Issuer.

67.     On December 23, Alex and Ani's attorney wrote back, explaining that the add-back

was plainly within the terms of the Agreement, and no default was present.

68.     Bank of America ignored this communication for more than a month, and never

responded to the central issue that **_Alex and Ani wasn't actually in default_**. Instead, on January

31, 2019, Bank of America made clear why it had invented a default in the first place. Bank of

America's January 31 letter dictated as *fiat*—using Alex and Ani's access to credit as existential leverage—all the onerous requirements Bank of America had been seeking to impose on Alex and Ani since it hired a female CFO.

69.     First, Bank of America reiterated that Alex and Ani's mission-critical Revolver was suspended:

> As a result of the occurrence of the Specified Event of Default, and in accordance with the Administrative Agent's rights under the Loan Documents, the Loan Parties were advised in the 12/19/18 Reservation of Rights Letter that (i) Revolving Loans shall be made, if at all, in the sole discretion of the Lenders and (ii) the issuance or amendment of Letters of Credit shall be issued or amended, if at all, in the sole discretion of the L/C Issuer. We reiterate that the Lenders have no obligation to extend credit to the Loan Parties under the Revolving Facility.

70.     Second, Bank of America raised the interest rate on all of Alex and Ani's loans (even the ones it couldn't actually access):

> The Administrative Agent received a Loan Notice from the Borrower to continue the Outstanding Amount of the Term Loan as a Eurodollar Rate Loan for a period of thirty (30) days effective on the date of this Letter. We wish to point out that, pursuant to Section 2.02(c) of the Credit Agreement, during the existence of a Default, no Loans may be requested as, converted to or continued as Eurodollar Rate Loans without the consent of the Required Lenders, and the Required Lenders may demand that any or all of the outstanding Eurodollar Rate Loans be converted immediately to Base Rate Loans. As a one-time accommodation to the Borrower, the Administrative Agent and the Required Lenders have consented to the Borrower's request as set forth in the subject Loan Notice. However, please be advised that the Administrative Agent and the Required Lenders intend, at this juncture, to strictly enforce the aforesaid provision. Accordingly, following the expiration of the above referenced Interest Period all Outstanding Amounts will be converted to Base Rate Loans.

71.     And third, Bank of America required Alex and Ani to hire expensive third party consultants to do the work that Ruda was already doing—and to pay for these consultants out of Alex and Ani's own pocket:

We would also like to inform you that, pursuant to the rights accorded to the Administrative Agent in the Credit Agreement, this office will, on behalf of the Administrative Agent, engage the services of Berkeley Research Group (BRO), a financial consulting firm. BRO will provide financial consulting and advisory services to this office and the Administrative Agent with respect to the commercial lending relationship memorialized in the Loan Documents. The Administrative Agent expects that all of the Loan Parties will fully cooperate with BRG's representatives, and in that regard, the Loan Parties are expected to provide such representatives full access to their respective books and records, properties and officers, directors and accountants. BRG's fees and expenses will be the Loan Parties' responsibility.

**e.     Bank of America Drives Alex and Ani Toward Insolvency, Despite Its Continued Profitability and Success**

72.     In the five months since the January 31 letter, Bank of America has continued to make unjustified default allegations; to milk Alex and Ani for tens of millions of dollars in additional fees and interest; to deploy expensive (millions of dollars), disruptive outside consultants through Alex and Ani at the company's expense; and to ensure that *no* bank—not just Bank of America—lends Alex and Ani the money it needs for vital expenditures such as marketing, vendor payment, and early outlays for the critical Holiday season.

73.     Bank of America hasn't just been greedy, it has been duplicitous.  For example, throughout 2019, Bank of America has misled, and outright lied, to Ruda and Alex and Ani to extract concessions like the hiring of expensive outside consultants.  In one case, Bank of America lied to Ruda about a meeting with creditors that did not exist in order to force Alex and Ani to hire BofA's multi-million dollar consulting partners, Berkeley Research Group.

74.     Most recently, Bank of America has *refused to disclose to Alex and Ani the results of a restructuring analysis that BofA made Alex and Ani pay for, which pertains to suggested actions by and within Alex and Ani itself*. No other conclusion can fairly be drawn from this action than that Bank of America is trying to force Alex and Ani, *which is still successful and*

***profitable outside of Bank of America's shenanigans***, to pay for its own demise—and a planned takeover by Bank of America's team of outsiders.

75.     Bank of America's actions over the past few months—starting with a made-up default, and culminating in a deliberate plan to starve Alex and Ani of credit from any source—have sent a once-thriving American success story into a death spiral, with 1,500 jobs in potentially in the balance. Alex and Ani has already lost several hundred million dollars in value as a result of Bank of America's wrongful actions.

76.     If Alex and Ani is to recover, it needs access to Revolving capital, and it needs Bank of America to start honoring its contractual commitments—and its public commitment to "invest in women."

77.     However, as described below, the latter would run counter to Bank of America's longstanding corporate culture of discrimination against women, underrepresented minorities, and other protected groups.

**f.      Bank of America's History of Discrimination**

78.     Bank of America has a long, entrenched history of illegal discrimination, including near-constant settlements, fines, and penalties for discrimination on the basis of gender.

79.     For example, in 2010, Bank of America was sued for gender discrimination by a class of approximately 4,800 current and former female financial advisers. The lawsuit alleged that Bank of America paid its female financial advisers less than men, deprived women from handling lucrative accounts, and retaliated against them if they complained. In 2013, Bank of America settled that lawsuit for $39 million.

80.     In 2016, Bank America was sued again for gender discrimination. The plaintiff in the 2016 lawsuit—one of BofA's top female employees—described the bank as a "bro's club" that favored male employees over women. Again, Bank of America settled.

81.     In fact, since 2000, Bank of America has publicly settled at least eight discrimination actions for more than $210 million—more than any other American company.

82.     Simply put, Bank of America has a problem with discrimination—especially gender discrimination.

83.     In this particular case, Bank of America's sexist, discriminatory history and culture help to explain behaviors that would otherwise seem odd for an ostensibly dispassionate lender. For example, a dispassionate lender probably wouldn't cozy up to an objectively terrible CFO (Woodruff), yet demand that an objectively great CFO (Ruda) be replaced.

84.     Except that this is Andrea Ruda:



85.     And this is Bob Woodruff:



86.     And these are the men from the bank:



87.     Similarly, a dispassionate lender presumably wouldn't invent a nonexistent default just to install an outside CRO at a successful company headed by one of the world's most successful self-made entrepreneurs.

88.     Except that this is the self-made entrepreneur (and her right-hand woman):

 

89.     And this is the outside CRO:



90.     And these are the men from the bank:



91.     Alex and Ani brings this case to put an end to the Bank of America's nonsense.  It is time for Bank of America to treat Alex and Ani fairly—and in accordance with Bank of America's legal obligations—even though Alex and Ani is run by strong, powerful women.

<u>**COUNT ONE**</u>
**Breach of Contract**
**(by both Plaintiffs against Bank of America)**

92.     Alex and Ani realleges and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth here.

93.     On January 29, 2016, Bank of America and Alex and Ani entered into the Agreement. The Agreement was executed by Bank of America and by each Plaintiff, forming a contract between the parties. The Agreement was amended on June 27, 2016 ("First Amendment"), October 5, 2016 ("Second Amendment"), and June 7, 2017 ("Third Amendment"), each time through execution by Bank of America and each Plaintiff, forming a contract between the parties.

94.     Alex and Ani performed as required under the terms of the Agreement (as amended). In particular, Article VIII of the Agreement, titled Events of Default and Remedies, recites fifteen enumerated actions that "shall constitute an Event of Default." Between May 2018 and June 2019, Alex and Ani did not experience of commit any of the enumerated items (as amended), and therefore did not default.

95.     Of note here, item (d) of Article VIII, titled "Representations and Warranties," states that it "shall constitute an Event of Default" if:

> [a]ny representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrower or any other Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading when made or deemed made . . . .

96.     At no time in 2018 or 2019 did Alex and Ani make a Representation and Warranty that was "incorrect or misleading when made or deemed made" within the meaning of item (d) of Article VIII.

97.     For example, on November 30, 2018, Alex and Ani executed a Compliance Certificate for the twelve month period ended November 3, 2018. This Compliance Certificate was not incorrect or misleading when made or deemed made within the meaning of item (d) of Article VIII.

98.     In particular, the November 30, 2018 Compliance Certificate itemized $8,723,000 under "fees or expenses . . . incurred in connection with any Permitted Acquisition, Disposition, Indebtedness . . .": a so-called "add-back" governed by section (viii) of the definition of "Consolidated EBITDA" in the Agreement:

> fees and expenses (or minus cash income or gain) incurred in connection with any Permitted Acquisition, Disposition, Indebtedness (including, without limitation, under this Agreement) incurred, refinanced, modified or repaid, Equity Interests issued, Investments made and recapitalizations, in each case, to the extent permitted under this Agreement, whether or not successful and in an aggregate amount for this clause (viii) not to exceed $3,500,000 in any period of four consecutive fiscal quarters . . . .

99.     The $8,723,000 add-back represented a contingent payment incurred in connection with the acquisition of Alex and Ani's supplier—*i.e.*, a portion of the supplier purchase price held back by Alex and Ani, payable only if supplier fulfilled certain obligations. This was indisputably a "fee[] [or] expense[]" within the meaning of section (vii) of the definition of "Consolidated EBITDA" in the Agreement.  Moreover, the supplier acquisition, which was the raison d'etre for

the Agreement and was well-known to all parties, including Bank of America, was indisputably a "Permitted Acquisition, Disposition, [or] Indebtedness" under the Agreement.  In fact, page 82 of the Agreement contains a section expressly directed toward the supplier acquisition, which section not only permits this acquisition, but *requires* it, and expressly contemplates the supplier "Holdback Amount . . . not to exceed $12.5 million."

100.    To the extent there was any ambiguity in the above (there was not), the First Amendment made things even clearer, adding: "Consolidated EBITDA shall be calculated on a Pro Forma Basis."  In short, the First Amendment clarified that under the Agreement, Consolidated EBITDA would exclude unusual or nonrecurring transactions. There is no basis—*none*—to argue that a contingent payment incurred as part of a one-time, large acquisition is not an unusual or nonrecurring transaction for purposes of Pro Forma Consolidated EBITDA under the Agreement.

101.    Simply put, the $8,723,000 add-back was properly categorized, and the November 30, 2018 Compliance Certificate was accurate. Alex and Ani performed under the Agreement in that it did not default between May 2018 and June 2019.

102.    Additionally, Alex and Ani performed under the Agreement in all other respects. For example, from May 2018 through June 2019, Alex and Ani made *all* payments required under the Agreement, and in fact brought the revolving loan instrument to zero in December 2018.

103.    Although Alex and Ani performed its obligations under the Agreement, Bank of America did not.

104.    For example, Article II of the Agreement, titled "Loans," requires in subsection (b) that "each Revolving Lender severally agrees to make loans . . . to the Borrower, in Dollars from time to time, on any Business Day during the Availability Period." The availability of the Revolving Loan facility under the agreement is mandatory, subject to Article IV, Section 4.02, which requires (a) true and correct Representations and Warranties and (b) no default, for the extension of credit under the Agreement.

105.    As set forth above, Alex and Ani's November 30, 2018 Representations and Warranties were true and correct (as were all Alex and Ani's other relevant Representations and Warranties), and there was no uncured default from May 2018 through June 2019.

106.    Accordingly, from at least May 2018 through June 2019, Bank of America and the other Revolving Lenders were required under the Agreement to "make loans . . . to [Alex and Ani], in Dollars from time to time, on any Business Day" up to the amount of the Revolving Facility—$50 million.

107.    However, beginning on December 18, 2018, Bank of America failed to perform under the Agreement, and in fact induced the other lenders not to perform under the Agreement either.

108.    Specifically, beginning on December 18, 2018, Bank of America "elected, as of the date of this letter, that (i) Revolving Loans shall be made, if at all, in the sole discretion of the Lenders."  This was a breach of Article II of the Agreement.

109.    Alex and Ani was injured by Bank of America's breach.  For example, Alex and Ani has not had access to Revolving Loans for at least five months as a result of Bank of America's non-performance under Section II, and as a direct result, at least the following harm has come to Alex and Ani:

- lack of seasonal inventory reduced revenues for 2019 Valentine's Day and Mother's Day seasons by more than $10 million combined;

- vendor payments have been on average 81 or more days late, with close to $16 million in vendor payables currently outstanding, damaging vendor relationships;

- shipment of new products is delayed, preventing revenue growth;

- negative influence on morale, reducing employee productivity;

- new concept launches have been postponed, and new initiatives (e.g., the Game of Thrones™ line of jewelry) was compromised;

- future planning cycles—including planning for the revenue-critical Christmas/Holiday period—have been delayed;

- vendor, supplier, and licensor relationships have been existentially threatened;

- inability to pay for marketing has irreversibly harmed this year's sales, potentially irreversibly imperiling upcoming Christmas/Holiday revenues;

- total negative sales impact from since December 18, 2018 default letter is estimated to be $80 million; and

- company valuation has dropped by nine figures, and continues to fall.

110. Alex and Ani seeks declaratory and injunctive relief, as well as all available damages, for Bank of America's breach.

**COUNT TWO**
**Tortious Interference with Prospective Business Relations**
**(by Alex and Ani, LLC against Bank of America)**

111. Alex and Ani realleges and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth here.

112. Prior to December 18, 2018, Alex and Ani had valuable, sensitive business relations with third parties, including vendors, suppliers, shippers, marketers, and licensors (among others).

113. These third parties are critical to the growth and profitability of Alex and Ani's business.

114. Using dishonest, unfair, and improper means (e.g., fabricating a default when it knew none existed, refusing to engage with Alex and Ani to resolve the alleged default, and improperly suspending Alex and Ani's revolving loan facility based on the non-existent default), Bank of America interfered with these sensitive third-party business relationships.  For example, by dishonestly, unfairly, and improperly suspending Alex and Ani's access to capital in a highly seasonal business, Bank of America injured Alex and Ani's valuable business relationships with third party vendors, suppliers, shippers, marketers, and licensors (among others), all of whom have been denied or delayed payment, and/or otherwise been exposed to instability or uncertainty in Alex and Ani's ability to pay for gods and services.

115. As a result of Bank of America's tortious interference, Alex and Ani has been damaged in at least the following ways identified in Count One.

116.    Alex and Ani seeks declaratory and injunctive relief, as well as all available damages, for Bank of America's tortious interference.

**COUNT THREE**
**Violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691**
**(by both Plaintiffs against Bank of America)**

117.    Alex and Ani realleges and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth here.

118.    Alex and Ani is an "applicant" under Equal Credit Opportunity Act, 15 U.S.C. §§ 1691a(b) and (f) with respect to Bank of America.

119.    Bank of America is a "creditor" under the Equal Credit Opportunity Act with respect to Alex and Ani, 15 U.S.C. § 1691a(e) and (f).

120.    Alex and Ani is run by three women: CEO Carolyn Rafaelian, CFO Andrea Ruda, and SVP of Brand Strategy Kate Robinson.

121.    As described earlier in this Complaint, Bank of America discriminated against Alex and Ani with respect to at least one aspect of a credit transaction (e.g., Bank of America's notices of default; Bank of America's suspension of the Revolver; Bank of America's insistence on expensive male consultants and interim executives as a condition of the alleged default; Bank of America's surreptitious coordination with an ostensibly independent CRO) on the basis of sex, based on the fact that the top three executives at Alex and Ani are all women.

122.    Alex and Ani's Chief Financial Officer Andrea Ruda is a twenty-eight-year-old woman.

123.    As described earlier in this Complaint, Bank of America discriminated against Alex and Ani with respect to at least one aspect of a credit transaction (e.g., Bank of America's notices of default; Bank of America's suspension of the Revolver; Bank of America's insistence on expensive male consultants and interim executives as a condition of alleged default; Bank of America's surreptitious coordination with an ostensibly independent CRO) on the basis of age, based on the fact that the CFO at Alex and Ani is a twenty-eight-year-old woman.

124.    As one specific example, during a 2019 meeting between Bank of America representatives and the Alex and Ani leadership team, the BofA team (of men) stressed the number of years they had worked in company finance. From there, each member of the Alex and Ani leadership team then shared their own respective experiences and roles at the company. These introductions were met by smirks from BofA's counsel. Ruda described, among other things, her significant experience in restructurings during her time at Accenture. However, later in this same meeting, a Bank of America representative said the bank was requiring Alex and Ani to hire a Chief Restructuring Officer because neither Rafaelian, Robinson, nor Ruda had any restructuring experience. This was false—and contrary to what had been explained to Bank of America just minutes prior. When Ruda corrected the Bank of America representative, BofA employee interrupted and said, "[m]aybe that's true, but if you were getting surgery, would you rather have the doctor that's done the surgery a few times, or has done it for years?"[14]

125.    The real reason Bank of America invented a nonexistent default, cut off Alex and Ani's revolver, and forced the company to hire a Chief Restructuring Officer wasn't Ruda's—or Rafaelian's, or Robinson's—lack of skills or experience. It was because Bank of America discriminates on the basis of gender and age in its lending practices, and it did so here in the context of its relationship with Alex and Ani—with massive harm to the company.

126.    As a result of Bank of America's discrimination against Alex and Ani on the basis of sex and age, Alex and Ani has been damaged through its inability to use its Revolver, which proximately caused harm of at least the amounts and types described in Count I, including approximately $1.2 billion in damages.

---

[14] In fact, it is hardly evident that Alex and Ani—a profitable company that always paid its bills on time and was thriving under existing management—needed a "restructuring" by anyone. But regardless, a restructuring by expensive, all-male outside consultants of this female-founded, female-led company was indisputably uncalled for from a business perspective.

127.    As a result of Bank of America's violations, Alex and Ani is entitled to actual and punitive damages, equitable and declaratory relief, costs of the action, and its reasonable attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs pray for judgment and relief as follows:

A.  Declare that Bank of America has breached the Agreement, tortiously interfered with Plaintiffs' prospective business relations, and violated the Equal Credit Opportunity Act by discriminating against Plaintiffs' on the basis of gender and age;

B.  Permanently enjoin Bank of America from further violations of the Agreement, from further tortious interference, and from further violations of the Equal Credit Opportunity Act with respect to credit transactions involving Plaintiffs;

C.  Order Bank of America to pay compensatory damages, including but not limited to Plaintiffs' lost profits;

D.  Order Bank of America to pay punitive damages, including for its violations of the Equal Credit Opportunity Act;

E.  Order Bank of America to disgorge its ill-gotten gains, including the additional interest and fees it has gained through breaching the Agreement, tortiously interfering, and violating the Equal Credit Opportunity Act;

F.  Order Bank of America to pay Plaintiffs' reasonable costs and attorney's fees;

G.  Award Plaintiffs pre-judgment interest; and

H.  Grant other such relief as the Court deems appropriate.

## JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all issues triable before a jury.

Dated:  July 25, 2019                    Respectfully Submitted,

/s/ Harmeet K. Dhillon_____
Harmeet K. Dhillon (SDNY 6057)
*harmeet@dhillonlaw.com*
Nitoj Singh (*pro hac vice* to be filed)
*nsingh@dhillonlaw.com*
DHILLON LAW GROUP, INC.
177 Post St. Suite 700
San Francisco, CA 94108
(415) 433-1700

Brian J. Dunne (NY 4605580) (SDNY pending)
*bdunne@piercebainbridge.com*
PIERCE BAINBRIDGE BECK PRICE & HECHT LLP
355 S. Grand Ave. 44th Floor
Los Angeles, CA 90071
(213) 262-9333

David L. Hecht (SDNY DH4084)
*dhecht@piercebainbridge.com*
PIERCE BAINBRIDGE BECK PRICE & HECHT LLP
277 Park Avenue, 45th Floor
New York, NY 10172
(212) 484-9866

***COUNSEL FOR PLAINTIFFS***
***Alex and Ani, LLC and***
***A and A Shareholding Co., LLC***